UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEGAN THOMAS LAW, PLLC,<br><br>Plaintiff,<br><br>vs.<br><br>SYRACUSE REGIONAL AIRPORT AUTHORITY, JASON MEHL, in his official capacity as Chief Commercial Officer of Syracuse Regional Airport Authority, and JASON TERRERI, in his official capacity as Executive Director of Syracuse Regional Airport Authority,<br><br>Defendants. | **DECLARATION**<br><br>**Civil Action No.: 5:25-cv-01114 (AJB/ML)** |

LINDA RYAN, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury that the following is true and correct:

1.      I am employed by Syracuse Regional Airport Authority ("SRAA"), one of the named Defendants in this lawsuit. My current position with SRAA is Terminal Concessions & Advertising Manager, a role I assumed on July 1 of this year. Prior to that, I had served as the Director of Business Development since September 2020. I began at SRAA as the Aviation Contracting Officer in August 2015 and remained in that role until being promoted to Director of Business Development. I am familiar with the facts of this matter and submit this Declaration in opposition to Plaintiff's Order to Show Cause (Dkt. 8).

2.      I have been primarily responsible for the day-to-day oversight of the airport's advertising space since 2021. I have a usual process that I follow when engaging with potential advertisers, and it is consistent with the interactions I had with Megan Thomas of Megan Thomas Law, PLLC this past summer.

3. In response to the initial inquiry, I send the advertiser a power point presentation and invite them to tour the space. Typically, during or after the tour the advertiser informs me of which area(s) they are interested in (e.g. arrivals, departures, both.) The substance or nature of the ad is rarely, if ever, discussed during the tour. The focus is on the space. Once they select the specific location for their ad, I present them with a contract. If the advertiser is not working with a graphic artist, I inform them that we have someone we can refer them to, and if applicable, make the introduction. It is by no means required that the advertiser use our suggested artist. In fact, many don't.

4. Our contract clearly states that SRAA has final approval of the ad before it goes up. This requirement for SRAA approval is also noted in our policy, which is posted on our website. The majority of ads I personally review and approve. If I have a question about a particular ad, I do run it by my supervisor, Jason Mehl.

5. I received an introductory email from Ms. Thomas on or about June 27, 2025. In response I sent her our standard power point. We eventually scheduled a tour for July 15, 2025. During the tour, Ms. Thomas told me her target audience was female business travelers. I do not recall any reference a to "creepy boss" or ideas about her billboard. We had no discussion about the substance or style or wording of her ad, or what it would include. As such, I did not offer her any "positive support" as is alleged in Paragraph 6 of Ms. Thomas' Declaration. I did not comment on her "messaging" at all.

6. I did not pressure Ms. Thomas into selecting a space or a start date. She indicated that she was eager to get her ad up as soon as possible. I told her that our contracts begin on the 1st of each month and suggested that she would need to move quickly to have an ad up by August 1. She indicated that she was not working with an artist, so I introduced her by email to a

graphic artist, Rob Oliver, a contractor with whom SRAA often works. Mr. Oliver is not employed by or otherwise affiliated with SRAA. I also sent her a proposed contract on July 15, 2025. I received her signed contract back on July 17, 2025.

7. Ms. Thomas sent me a screen shot of her ad at around noon on July 22, 2025. Initially, I was struck by how different the proposed ad was, in style and in tone, from our other ads. Specifically, the tag line – "When HR called it harmless flirting . . . we called it EXHIBIT A" – struck me as much more provocative than other advertisements on display at the Airport. My first thought was that this ad had not been created by Mr. Oliver and that it was the wrong size. I reached out to Mr. Oliver and asked if he was working with Ms. Thomas and he said yes that he had sent her a proof and was waiting for her approval. I told him it appeared to be the wrong size and sent him the correct dimensions. At no time did I ever "approve" the ad – either to Ms. Thomas or Mr. Oliver. That is not my role at that stage of the design process.

8. Mr. Oliver e-mailed me Ms. Thomas' "Ready to Print" proof on July 22, 2025. My regular work hours are 8-4 and it was sent at 4:25 p.m. As such, I did not see his email until I arrived at work on the morning of July 23rd. The proof still contained the tag line, and I was again struck by how different it was, in style and in tone, from our other ads.

9. Earlier this year, one of our plastic surgery advertisers had purchased additional space for a new ad with different graphics. Jason Mehl and I had a conversation at that time, where it was discussed that going forward, we needed to be mindful of our overall messaging throughout the terminal. I recalled this conversation when I saw Ms. Thomas' ad and sent it to Mr. Mehl for review via e-mail that morning.

10. Mr. Mehl then came to my office to discuss the ad. I remember one of his first comments was along the lines of "This would be a great ad ... if it were on a billboard." In

3

other words, when someone sees a provocative ad on a billboard, there is no responsible entity to associate it with. That is not the case for ads that appear at the airport. Such ads are reflective of SRAA. We agreed that we should have other eyes on the ad before making a decision on approval. While we were discussing this, our Employee Relations and Compliance Specialist, Katie Tiisler, came into my office. Her initial reaction to the ad was "I don't like that at all."

11.     I sent an e-mail to Ms. Thomas at 10:21 a.m. on July 23 explaining our concerns with the ad. If I recall, we played a bit of phone tag but ultimately had a conversation in the afternoon. I recall Ms. Thomas saying to me (in response to my e-mail) "This doesn't seem right." I replied that I understood her concern, but that I had run the ad by several people and there was a consensus that in order to be approved, it needed to be toned down. I did tell her that one of the comments was "I feel attacked as a man."

12.     Ms. Thomas became agitated and I recall her saying something to the effect of, "Honestly then I don't know if I want to even be at the airport anymore." I told her that it was up to her, but if she wanted to continue with the process, we were going to need a modified version of her ad. That was the last time I spoke with Ms. Thomas.

13.     Upon the SRAA Board's adoption of an amended advertising policy on September 12, 2025, I have and/or am in the process of notifying existing Terminal advertisers of the new policy and that all currently posted advertisements have been deemed to comply with said policy.

**By signing below, I declare under penalty of perjury that the foregoing is true and correct. Executed on September 17th, 2025.**

_Linda Ryan_
**Linda Ryan**

4