**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------X

MEGAN THOMAS LAW, PLLC,

                         Plaintiff,

                                                    Civil Action #:5:25-cv-01114

      v.                                        (AJB/ML)

SYRACUSE REGIONAL AIRPORT
AUTHORITY, JASON MEHL, in his
official capacity as Chief Commercial
Officer of Syracuse Regional Airport Authority, and
JASON TERRERI, in his
official capacity as Executive Director of Syracuse
Regional Airport Authority,

                          Defendants.

------------------------------------------------------------------------------X

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**THE REMAINING INJUNCTION FACTORS WEIGH DECISIVELY IN PLAINTIFF'S FAVOR**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................... 3

FACTUAL BACKGROUND .............................................................................. 5

ARGUMENT ..................................................................................................... 9

   I.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS BECAUSE SRAA ENGAGED IN IMPERMISSIBLE VIEWPOINT DISCRIMINATION IN A DESIGNATED PUBLIC FORUM ................................................................. 10

      A.  SRAA Created a Designated Public Forum By Permitting a Multitude of Commercial Advertisements on a Wide Range of Topics .......................... 11

      B.  Even if This Court were to Find that the Advertising Space is a Nonpublic Forum, SRAA's Unevenly Applied and Ever Shifting Justifications of its Purported Policy Reveal Clear Viewpoint Discrimination ................... 15

  II.   SRAA'S POST-HOC RATIONALIZATIONS AND NEWLY ADOPTED POLICY CANNOT CURE ITS CONSTITUTIONAL VIOLATION ............................................................................................... 18

  III.  THE REMAINING INJUNTION FACTORS WEIGHT DECISIVELY IN PLAINTIFF'S FAVOR ......................................................................... 20

CONCLUSION ............................................................................................. 23

## TABLE OF AUTHORITIES

Abdul Wali v. Coughlin
754 F.2d 1015, 1024-25 (2d. Cir. 1985) ........................................................ 23

Air Line Pilots Ass'n, Int'l v. Dep't of Aviation,
    45 F.3d 1144 (7th Cir. 1995) ........................................................ 10, 14, 15

Am. Freedom Def. Initiative v. Metro. Transp. Auth.,
    109 F. Supp. 3d 626 (S.D.N.Y. 2015) ........................................................ 19
    815 F3d 105, 109 [2d Cir 2016]

Am. Freedom Defense Initiative v. King County, ........................................................ 21
    796 F3d 1165, 1172 [9th Cir 2015])
Benihana, Inc. v. Benihana of Tokyo, LLC,
784 F.3d 887, 895 (2d Cir. 2015) ........................................................ 9

Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,
    473 U.S. 788 (1985) ........................................................ 10, 15

Elrod v. Burns,
    427, U.S. 347, 347 (1976) ........................................................ 21

Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,
    505 U.S. 672 (1992) ........................................................ 11, 14

Lebron v. AMTRAK,
    69 F.3d 650 (2d Cir. 1995) ........................................................ 10, 15

N.Y. Mag. v. Metro. Transp. Auth.,
    136 F.3d 123 (2d Cir. 1998) ........................................................ 11, 21

N.Y. Progress & Prot. PAC v. Walsh,
    733 F.3d 483 (2d Cir. 2013) ........................................................ 22

Perry Educ. Ass'n v. Perry Local Educators' Ass'n,
    460 U.S. 37, 45 (1983) ........................................................ 11

Rosenberger v. Rector & Visitors of Univ. of Va.,
    515 U.S. 819, 829 (1995) ........................................................ 16

OTHER REFERENCES
*See New York State Revises Sexual Harassment Prevention Guidance.* May 1, 2023. .
https://www.shrm.org/topics-tools/employment-law-compliance/new-york-state-revises-
sexual-harassment-prevention-guidance ........................................................ 13

## PRELIMINARY STATEMENT

Defendants' opposition to the requested preliminary injunction rests on a foundation of shifting justifications, factual misrepresentations, and a profound misapplication of First Amendment law as established by the Supreme Court and this Circuit. As set forth in detail in Plaintiff's moving papers, by opening its terminal to a wide array of commercial advertisers, the Syracuse Regional Aviation Authority ("Defendants," "SRAA," or the "Airport") created a designated public forum for commercial speech. Knowing that it has no answer for the well-settled First Amendment law arrayed against it, SRAA has now resorted to shifting ground. More particularly, in a desperate attempt to rescue its malfeasance exposed by this lawsuit, the Airport engaged in post-hoc policy changes to escape liability and dismiss the case. It is respectfully submitted that such post-hoc rationales should not be countenanced. The Court should view these maneuvers for what they are: transparent efforts to rewrite history and evade accountability. Indeed, it is axiomatic that a policy created after the fact cannot govern a pre-existing contract. The 2025 policy ("2025 Policy") is nothing more than a desperate rationalization designed to launder SRAA's subjective discomfort with the Ad.

Make no mistake, SRAA's rejection of Plaintiff Megan Thomas Law, PLLC's ("the Firm" or "Plaintiff") advertisement is blatant viewpoint discrimination. The advertisement (the "Ad"), which falls squarely within the bounds of protected commercial speech, was rejected not for any legitimate, consistently-applied reason, but because SRAA leadership felt "attacked as a man" by the message, "When HR called it harmless flirting ... we called it EXHIBIT A." (Thomas Decl., ¶ 21; Complaint, ¶ 5; Ryan Decl., ¶ 11). SRAA's hypocrisy is glaring. It welcomes - and profits from - enormous, provocative displays advertising "Breast Augmentation," "Liposuction," and "Male

Enhancement," and permits other law firms to advertise litigation services, including for "employment discrimination." (Thomas Decl., ¶¶ 22-23, Ex. H, Ex. I). Yet, it deems the Firm's rights-affirming message empowering victims of sexual harassment, rights protected by law, too "sensitive" for the traveling public.

Apart from these red herrings, SRAA's defense hinges on enforcing a purported 2023 advertising "policy" ("2023 Policy") that it never provided, mentioned, or referenced in any of the marketing materials or direct communications leading up to the contract. (Complaint, ¶ 28). Make no mistake, 2023 Policy was not the reason this motion was filed. Rather, this motion was brought as a direct result of SRAA's unconstitutional rejection of the Ad that rested on an ever-shifting set of assertions, inconsistently applied reasoning, and vague contract language. The Court should see this policy maneuver for what it is and reject it outright.

Moreover, the Airport contradictorily argues that the Firm's Ad is, *inter alia*, disparaging of other groups and misleading. The Airport contends that no other advertisement at the Airport disparages other groups. This both misses the point and is inaccurate. The issue is, the Firm's Ad has been rejected for reasons that have not been consistently applied to other advertisements. It has been placed under a microscope while the Airport has scrambled to invent reasons to reject it. Further, the Ad does not disparage other groups by suggesting that a group may face litigation for unlawful behavior. Even if it does, other firms that advertise also promote "litigation" and "divorce," which could also be seen as "disparaging." Finally, the allegation that the Ad is misleading is, again, reasoning that is not applied consistently to other advertisements, including advertisements from other law firms that contend they are the "best" and "will make things right."

Moreover, Defendants take the self-serving position that the Airport terminals are not a designated public forum. However, it is not the terminals that are at issue, but rather

the advertising space.  It is clear that both policy and practice have allowed a broad range of commercial advertisements at the Airport, which that the advertising space constitutes a designated public forum.  Tellingly, the Airport can point to only one other advertisement that was rejected.  To support its argument that the space is a nonpublic forum, SRAA's opposition leans heavily on cases involving the rejection of religious or political advertising, but those authorities are plainly inapposite to this dispute over commercial speech.

For these reasons, those set forth below, and for all of the reasons set forth in Plaintiff's moving papers, it is respectfully submitted that this Court should issue the requested injunction.

## **FACTUAL BACKGROUND**

While many of the underlying facts are not in dispute, the parties disagree about the true reason for SRAA's denial of the Firm's Ad.  Now, Defendants' own submissions reveal the undeniable, discriminatory basis for rejecting the Firm's advertisement and exposes its subsequent justifications for what they are, pretext.  Defendants cannot escape the central fact of this case: the advertisement was rejected because SRAA leadership found it threatening to men.

To wit, SRAA's Terminal Concessions & Advertising Manager, Linda Ryan, admits this in her Declaration.  After the advertisement was shared with SRAA leadership, Ms. Ryan communicated the Airport's concerns to Ms. Thomas.  While the parties account of exactly what was said differs, Ms. Ryan admits: "I did tell her that one of the comments was '"I feel attacked as a man."' (Ryan Decl., ¶ 11).  This admission directly corroborates Ms. Thomas' sworn testimony and the assertion that the denial was based on the viewpoint of men who felt intimidated by the advertisement. (Thomas

Decl., ¶ 13).  Importantly, until now, the Airport has denied that the foregoing statement by Ms. Ryan, or anything like it, was ever said.

Subsequent to this initial gender-based viewpoint being the stated reason for the denial, SRAA denied that the reasoning had to do with the effect on men.  Instead, its justifications begin to shift and multiply in an attempt to conceal its real reasons for the denial.  The stated reasoning evolved from concerns about the Ad offending "local politicians" (Thomas Decl., ¶ 15), to being "unprofessional, inflammatory, and unnecessary" (Thomas Decl., ¶ 21), to claims it "denigrates HR departments" (Complaint, ¶ 8).  Finally, weeks later, SRAA concocted yet another convoluted explanation that the Ad could "risk interfering with the efficient operation of the terminal" because sexual harassment is a "highly charged topic[]." (Thomas Decl.,¶ 22, Ex. G).  SRAA also befuddlingly argued that language "commonly connected with sensitive topics such as sexual harassment" (the protection from which is codified in state and federal law) "risks creating an atmosphere in which a broad range of passengers, both adults and children, are exposed to highly charged topics." (Thomas Decl., ¶ 22).  Most recently, SRAA offered that the Firm's Ad threatens to "irreparably harm" the Authority, and disrupt and distract passengers' "comfort and efficient travel."  (Defs.' Mem. at 2).[1]  These duplicitous statements are not convincing or accurate, and such reasoning has not been applied to any of the other advertisements at the Airport.

Defendants have since attempted to expunge the record of these discriminatory motives under the guise of a neutral policy designed to avoid "disruption and controversy." (Defs.' Mem. at 2).  Most recently, in its opposition, Defendants argued:

> Disparagement and threats featured in large, official
> ad space along the terminal walls could very

---

[1] For the convenience of the Court, all citations to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunctive Relief are to the ECF-generated page numbers of Document 20, hereinafter cited as "Defs.' Mem."

> reasonably result in passengers and airport tenants
> associating such content with the Airport or getting the
> impression that the Authority endorses such content,
> which could negatively impact their view of the Airport
> and dissuade them from patronizing or doing business
> with the Authority in the future.

(Defs.' Mem. at 14). This is an audacious statement when one considers what the Airport's walls are currently lined with, a saturation of advertisements for plastic surgery and med spa services. (Thomas Decl., ¶ 22, Ex. H). To argue that the Airport is concerned with being associated with the Firm's message, standing up for victims of sexual harassment and discrimination, but has no concern with being associated with advertisements trying to convince largely women to augment their bodies, is not only surprising, it is unabashed, blatant viewpoint discrimination.

The parties also disagree on what parts of the Firm's Ad were rejected and attacked. Throughout its Memorandum of Law, Defendants argue that it is merely the "tag line" that Defendants oppose. (Defs.' Mem. at 1, 3, 6). However, this is not supported by the record. Jason Terreri's August 14, 2025 letter rejects the Ad as a whole, stating the Firm could not use language commonly connected with sensitive topics such as sexual harassment, which are dispersed throughout the Ad. (Thomas Decl., Ex. G).

Moreover, Defendants contend that "all" of Plaintiff's proposed alternative advertisements convey a "similar tone." However, the tone varies. Moreover, SRAA cannot argue that the alternative statements denigrate or disparage HR, as they have previously alleged, because "HR" is missing from all of the alternative examples below.

- When your raise disappeared after you said no - that's Exhibit A.
- They called it locker room talk. We called it Exhibit A.
- Your boss's creepy texts? Exhibit A.
- We all have 99 problems, a creepy boss shouldn't be one.

- When your creepy boss calls it harmless flirtation, I call it a lawsuit.
- When your creepy boss comments on your body – we answer with the law.
- Unwanted touching at work isn't flirting – it's a lawsuit waiting to happen.
- Your boss shouldn't make you uncomfortable. But I can make them uncomfortable in court.
- When harassment isn't part of the job description, but your boss thinks it is . . .

(Compl., ¶ 28, Ex. F).

Defendant further states that the Firm failed to engage in negotiations: "rather than work with the Authority, however, the Firm filed this lawsuit." (Defs.' Mem. at 1). This is a blatant misrepresentation of the truth. The Firm first requested that Jason Mehl review and respond to its alternative slogans above. He agreed to, but never followed through. (Thomas Decl., ¶ 15). Instead, he patronizingly gave his own suggestions. *Id*. Mr. Mehl also told Ms. Thomas that there was "no First Amendment issue here" and the SRAA could reject or approve advertisements at will. *Id*. At that point, it was clear to Ms. Thomas that any negotiations would be futile, given that the Airport believed the Firm did not have any protections under the law.

Even still, Ms. Thomas waited until everyone at the Airport was back from vacation and the Airport could fully respond to her concerns with the rejection, before determining the appropriate next step was to file a lawsuit. (Thomas Decl., ¶ 20). Finally, even after this lawsuit was filed, Ms. Thomas has engaged in good faith discussions with Defendants, who notably now have no fewer than five lawyers working on this case. By contrast, SRAA responded to the Firm's FOIL requests by conveniently leaving out key advertisements, including the one of the law firm that also offered services for employment discrimination. SRAA also wholly failed to respond to Ms. Thomas' repeated requests to appear virtually at the meeting in which the SRAA's new policy was discussed. At the meeting, no discussion

8

ensued about the policy after an executive session was abruptly called. To state that the Firm abruptly filed a lawsuit without attempting to negotiate further is disingenuous and a futile attempt to paint the Plaintiff as overzealous and litigious. The truth is, SRAA thought it could bulldoze Plaintiff, a solo practitioner, into giving up its rights.

## **ARGUMENT**

Defendants' opposition brief attempts to contort a clear-cut case of viewpoint discrimination as a reasonable exercise of proprietary control over a nonpublic forum. This argument, however, is a house of cards built on misstated facts, a selective application of case law, and a transparently post-hoc effort to veil unconstitutional conduct. Defendants ask this Court to ignore SRAA's actual practice of permitting a wide variety of provocative commercial speech, complete with a naked woman in a bathtub and ads for "male enhancement," to accept its shifting and unevenly applied justifications for rejecting the Firm's advertisement, and to validate its belated attempt to evade judicial review by creating a new advertising policy weeks after this lawsuit was filed and months after Defendants entered into a contract with the Firm. The law and the facts permit none of this.

The parties agree, a party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tip in the movant's favor; and (4) that the public interest would not be disserved by the injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). As argued in the initial motion papers, Plaintiff easily satisfies all four factors. Defendants' arguments to the contrary are without merit and do nothing to weaken Plaintiff's case.

First, Defendants' claim that the Airport terminal is a nonpublic forum is belied

by its practice of opening advertising space to a wide array of commercial advertisers, creating a designated public forum in said advertising space where strict scrutiny applies.  Second, SRAA's rejection of the advertisement was neither reasonable nor viewpoint-neutral as Ms. Ryan makes clear in her Declaration.  Rather, it is a textbook case of viewpoint discrimination, motivated by a desire to suppress a message SRAA leadership found uncomfortable, all while allowing other, more provocative ads to stand that could easily offend others.  SRAA's attempts to characterize the Firm's Ad as uniquely "disparaging" or "misleading" are unavailing and pretextual, given its inconsistent application of these supposed standards.  Finally, SRAA's argument that its new, post-litigation 2025 Policy renders this case moot is legally baseless, laughable, and should be rejected for what it is, a post-hoc, duplicitous litigation tactic.  As demonstrated below, each of Defendants' arguments crumbles under scrutiny, and Plaintiff is entitled to the requested injunctive relief.

## I.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS BECAUSE SRAA ENGAGED IN IMPERMISSIBLE VIEWPOINT DISCRIMINATION IN A DESIGNATED PUBLIC FORUM.

Defendants' entire opposition hinges on its self-serving declaration that the Airport terminal's advertising space is a nonpublic forum, affording them wide latitude to restrict speech.  (Defs.' Mem. at 6–12).  There are two problems with this argument.  First, a government entity's stated intent is not dispositive.  The Court must examine the policy *and* practice of the government to determine what kind of forum exists.  (*Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 US 788, 802 [1985]); (*Lebron v AMTRAK*, 69 F3d 650, 661 [2d Cir 1995]) ("The proper inquiry, the Supreme Court has instructed, focuses not solely on past practice but on 'policy and practice.'"); *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1153–54 (7th Cir. 1995) ("actual policy -- as gleaned from the consistent practice with regard to various speakers.").  Here, SRAA's actual practice of opening the terminal to

a diverse and provocative range of commercial advertisers created a designated public forum in the advertising spaces.  In such a forum, its content-based rejection of the Firm's advertisement must survive strict scrutiny, a test it cannot possibly meet.

Secondly, Even if this Court finds the advertising space at the Airport is a nonpublic forum, the Airport may not engage in viewpoint discrimination.  Here the SRAA has clearly and unabashedly engaged in viewpoint discrimination given that it has allowed advertisements that may be considered offensive, disruptive, and/or threating to others, but has rejected the Firm's advertisement because it *could* be considered offensive, disruptive, and/or threatening to some.

## A. SRAA Created a Designated Public Forum in its Advertising Space By Permitting a Multitude of Commercial Advertisements on a Wide Range of Topics.

A government creates a designated public forum when it "has opened for use by the public as a place for expressive activity." (*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).  It is not a requirement of a designated public forum that all have access.  Indeed, a designated public forum, is property that the government "has opened for expressive activity by part or all of the public."  (*Intl. Socy. for Krishna Consciousness v. Lee*, 505 US 672, 678 [1992]).

In arguing that the advertising space at the Airport is not a public form, SRAA conveniently ignores its own conduct.  By selling advertising space to virtually all corners on a wide range of topics, including other law firms, local businesses, plastic surgery providers, and med spas, SRAA has intentionally opened a forum for commercial speech. *See N.Y. Mag. v. Metro. Transp. Auth.*, 136 F.3d 123, 128 (2d Cir. 1998).

Additionally, SRAA's argument that its policy and proprietary interest establish a nonpublic forum is unavailing. (Defs.' Mem. at 8-10). As a preliminary matter, SRAA

never provided the Firm with the 2023 Policy during contract negotiations; the only restriction the Firm was aware of was the vague contract language stating ads could not be "inappropriate, immoral, offensive or objectionable." (Complaint, ¶¶ 28, 33; Dkt. 1-3). The argument that the 2023 Policy was buried somewhere on SRAA's website is disingenuous and insufficient to put the Firm on notice of any specific prohibitions. (*See* Mehl Decl., ¶ 6). Even if the 2023 Policy controlled, it was overly broad and unenforceable. The 2023 Policy specifically allowed the Airport to reject an advertisement "for any reason," which is plainly unconstitutional. (*See* Mehl Decl., Ex. B).

Further, SRAA's *practice* disproves its claimed intent to maintain a limited, non-controversial forum. SRAA has accepted and displayed numerous advertisements on "sensitive topics," including enormous displays for "Breast Augmentation," "Tummy Tuck," and "Male Enhancement." (Thomas Decl., Ex. H). At the time Plaintiff filed the initial brief, Plaintiff was waiting on a response from the Airport to its FOIL request for all Airport ads. The Firm has since learned that there are additional provocative advertisements, including a naked woman in a bathtub with her breasts partially exposed. (Defs.' Mem., Ex. A, Part 11, p. 10). Tellingly, the SRAA can only point to *one* other time an advertisement was rejected - an ad for a nightclub with "sexually suggestive artwork and language portraying adulterous behavior." (Defs.' Mem. at 9). According to the SRAA, it has not rejected another commercial advertisement, including because it was misleading or disparaging. The FOIL response also reveals the Airport has not previously and patronizingly suggested alternative messaging to other entities.

Additionally, the Airport has approved advertisements for other entities that could be deemed "disparaging" to other groups. Another law firm explicitly offers services for "Employment Discrimination" and promises to "make things right." (Thomas Decl., Ex.

I). Furthermore, the SRAA has advertisements for a divorce attorney that reads, "Getting Divorced? Don't Pull Your Hair Out." It goes on to state "Best Affordable Divorce Lawyer for Divorce." (Defs.' Mem., Ex. A, Part 8, p. 10). By permitting this wide array of speech, SRAA has "opened the property for speech in a manner that is inconsistent with an intent to maintain a non-public forum."

Because the Airport is a designated public forum for commercial speech, any content-based restriction must be "narrowly drawn to achieve a compelling government interest." *NY Mag I*, 136 F.3d at 128. Restrictions on speech in designated public forums are permissible if the distinctions are drawn in a reasonable light of the purposes served by the forum and are viewpoint neutral. *Id* at 134. SRAA's asserted interests in avoiding "disruption and controversy" and providing a "pleasant experience" (Defs.' Mem. at 10, 13) fall far short of a compelling state interest, are unreasonable, and clearly constitute viewpoint discrimination.

Moreover, the state has a much more compelling interest in making sure victims of sexual harassment are protected. New York law affords victims of sexual harassment explicit rights and protections. Indeed, New York State has increased protections for victims and made it easier for them to avail themselves of updated laws and guidance, including mandatory workplace training on sexual harassment to increase awareness of this issue and victim's rights. (*See New York State Revises Sexual Harassment Prevention Guidance.* May 1, 2023. Last Accessed September 24, 2025. https://www.shrm.org/topics-tools/employment-law-compliance/new-york-state-revises-sexual-harassment-prevention-guidance).

Also, as explained herein, the SRAA's stated reasons for the initial rejection of this Ad were viewpoint concerns, namely that men will be intimidated or offended.

13

Finally, as explained further herein, the glaring double-standard that has been applied to this advertisement when compared with other advertisements that have been approved without question at the Airport demonstrates that the Airport is not applying its reasoning for rejecting advertisements evenly.

The Defendants reliance on *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee* (*"Krishna"*) to make the argument that the Airport forum is nonpublic, is misplaced because that case did not deal with airport advertising space but rather Airport terminals. In *Krishna*, the issue was whether a religious group could solicit money from passengers within the Airport's terminals. 505 U.S. 672, 675 (1992). The Court noted in that case, in 1992, that "Airports have not historically been made available for speech activity." *Id* at 680. Moreover, that case dealt with a religious organization as opposed to a commercial one. *Id.*

By contrast, here, in 2025, Airport commercial spaces have indeed become a designated public forum because the Airport has opened itself up to a multitude of viewpoints as the court contemplated in *Air Line Pilots Assn., Intl. v. Dept. of Aviation*. *Air Line Pilots Assn., Intl. v. Dept. of Aviation*, 45 F3d 1155-56. Further, the Firm is not advancing a religious message, but a commercial one similar to the existing advertisements at the Airport. Consequently, SRAA's heavy reliance on this case is erroneous.

Defendants contend that the Firm's reliance on *Air Line Pilots Assn., Intl. v. Dept. of Aviation,* is misplaced because it is not controlling or persuasive. Pertinently, Defendants found it persuasive given that SRAA changed its Policy after reading that the policy in this case, which is similar in nature to SRAA's broad 2023 Policy, was found to be overly broad. Furthermore, this case *is* persuasive here because the facts are

14

incredibly similar.  In both cases, an extremely broad Policy was used to justify the rejection of an advertisement the Airport was subjectively uncomfortable with.  *See Air Line Pilots Assn., Intl v. Dept. of Aviation*, 45 F3d 1148 (1994).  However, in practice, both Airports were allowing advertisements from other vendors that demonstrated they were not consistently applying their reasoning for rejecting the advertisements in question.  *Id* at 1155.  Finally, the Court in *Air Line Pilots v. Dept. of Aviation* emphasized that the proper question was not whether the airport as a whole constituted a public forum, but rather whether the advertising display cases constituted a public forum.  *Id* at 1160.  Similarly here, the Court should examine whether the advertising space constitutes a designated public forum.

Defendants focus on *Lebron v. AMTRAK* is also misplaced because in that case, the issue was political advertising, not commercial.  59 F. 3d 650 (1995).  In that case, it was undisputed that previously, only commercial advertisement had been allowed in the space.  59 F. 3d 654.  Therefore, the Court found that a political advertisement could be justifiably rejected.  *Id* at 658.

The First Amendment simply does not permit the government to sanitize public spaces of speech simply because some viewers might find it unpleasant or controversial.

**B. Even if This Court were to Find that the Advertising Space is a Nonpublic Forum, SRAA's Unevenly Applied and Ever Shifting Justifications of its Purported "Policy" Reveal Clear Viewpoint Discrimination.**

Even if the Court were to deem the terminal a nonpublic forum, SRAA's rejection of the Firm's Ad is plainly unconstitutional.  Restrictions in a nonpublic forum must be both reasonable and "not an effort to suppress expression merely because public officials oppose the speaker's view."  *Cornelius*, 473 U.S. at 800.  Here, SRAA's action was a blatant act of viewpoint discrimination.

The discriminatory motive is evident from SRAA's very first reaction.  SRAA's manager, Linda Ryan, admitted in her declaration that a key reason for the rejection was the comment, "I feel attacked as a man."  (Ryan Decl., ¶ 11).  This admission is a smoking gun.  Indeed, Ms. Ryan made it very clear in her call with Ms. Thomas that she was sorry to be delivering this message and that it was leadership, not she, that found fault with the Ad.  (Thomas Decl., ¶ 28).  Importantly, the stated reason "I feel attacked as a man" reveals that the decision was based not on a neutral application of policy, but on the perceived negative reaction of a particular group to the *viewpoint* of the message: that conduct some men might dismiss as "harmless flirting" can have real legal consequences under the law.  This is the essence of viewpoint discrimination.  *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant").

SRAA's subsequent, ever-evolving justifications are a transparent pretext to cover this initial discriminatory motive.  Again the reasons for rejection morphed several times.  This shifting sand of rationales demonstrates that SRAA had no consistent, neutral principle for its decision, but was instead searching for a plausible cover for its own subjective (and concerning) discomfort with the Firm's message.

The pretext is further exposed by comparing the Firm's advertisement to those SRAA has previously approved, and the glaring double standard that has been applied to the Firm's Ad when compared with other commercial advertisements.  Defendants have specifically alleged Plaintiff's Ad was rejected for a multitude of reasons, including because it was misleading and disparaging to a group.  These attempts to distinguish the Ad are disingenuous.  First, to argue that the Firm's Ad is misleading is to hold the Firm's Ad to a different standard that it has held other law firms too.  Other law firms, featuring

men, have been allowed to make statements such as that they are the "best" or that they will "make things right." Yet, the Firm's Ad, which makes no such representations, is deemed misleading. Why? Presumably because it suggests harmless flirting *could* be actionable under the law. This is in fact accurate and similar in nature to the messages conveying in the mandatory New York State employee harassment training.

Secondly, SRAA's position that another law firm's ad is acceptable because it does not "target or disparage the opposing parties" is misleading. (Defs.' Mem. at 17). Importantly, the Firm's Ad does not target a specific party; it targets a *behavior* and a *mindset* that dismisses sexual harassment. The claim that all of the other ads are merely "innocuous" descriptions of services (Defs.' Mem. at 16-17) is absurd. An attorney ad for "Employment Discrimination" litigation inherently implies controversy and taking sides. A divorce attorney must inherently take sides in a very intimate and family-oriented setting. Likewise, SRAA's argument that the cosmetic surgery ads are not threatening or disparaging to women (Defs.' Mem. at 17) ignores the obvious reality that such ads are widely viewed as preying on female insecurities.

Moreover, the Airport quizzically argues that the Firm's advertisement was denied because it disparages other groups. Yet, in a recently provided advertisement, there is disparaging language from a newly veneered home towards a run-down home. This could offend people who are not able to afford newly renovated homes. Yet, as further evidence that is engaging in viewpoint discrimination, the SRAA allowed this disparaging advertisement to run without concern. (Defs.' Mem., Ex. A, Dkt. 21 ).

Further, the Airport makes the outlandish argument that if it allowed this Ad to stand it "fears" it would be obligated to run advertisements which are similarly disparaging to victims of sexual harassment. (Defs.' Mem. at 24). This argument is nothing more than SRAA grasping at straws. As explained above, the language in the Ad is not disparaging.

There would be nothing wrong with an employment-side labor law firm advertising its services in a similarly innocuous manner.

SRAA's willingness to run the Ad with "softer" slogans further proves it was discriminating based on viewpoint rather than a categorical or subject ban.  The Airport was willing to allow speech about sexual harassment, but only if the message was diluted to its liking.  This   patronizing conduct constitutes unconstitutional viewpoint discrimination.

The only coherent distinction between the ads is that SRAA is comfortable with ads that objectify women's bodies or offer generic legal services that don't directly threaten men, but is uncomfortable with a woman-led firm's pointed, empowering message about holding harassers accountable and avails victims of their rights under the law.

## II. SRAA'S POST-HOC RATIONALIZATIONS AND NEWLY ADOPTED POLICY CANNOT CURE ITS CONSTITUTIONAL VIOLATION.

In an obvious attempt to evade judicial scrutiny of its unconstitutional conduct, SRAA argues that its adoption of a new advertising policy on September 12, 2025, nearly a month *after* this lawsuit was filed and months after Plaintiff entered into a contract with the Airport, somehow renders the Firm's claim for injunctive relief moot.  (Defs.' Mem. at 19–20).  This argument is legally baseless and fails for two independent reasons.  First, it is axiomatic that the policy in effect at the time of the constitutional violation is the policy that must be judged by this Court.  Second, a defendant cannot escape an injunction simply by adopting a new, supposedly curative policy after being sued, particularly where the new policy is merely a pretext to justify the same discriminatory rejection.  The case at hand is easily distinguishable from the cases cited by Defendants in support of this position.

SRAA's reliance on *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 109 F. Supp. 3d 626 (S.D.N.Y. 2015), is erroneous. In that case, the MTA changed its policy to ban *all* political advertising after a court had found its previous standard unconstitutional, a move that mooted the plaintiff's request to run a specific political ad. *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 109 F. Supp. 3d 635. Here, SRAA has not enacted a neutral, categorical ban. Instead, it has simply rewritten its discretionary policy to target the Firm's advertisement and create new, supposedly "objective" categories, like prohibiting "objectionable" or "misleading" content, which it now claims justify its initial rejection. (Defs.' Mem. at 20).

In addition, under the voluntary cessation doctrine, the voluntary cessation of challenged conduct will not render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed. (*Am. Freedom Defense Initiative v Metro. Transp. Auth.*, 815 F3d 105, 109 [2d Cir 2016]).

The 2025 Policy constitutes SRAA changing the rules mid-game. Moreover, this injunction was not brought because of the 2023 Policy, it was brought as a direct result of SRAA's actions that resulted in its denial of Plaintiff's Ad. Consequently, SRAA's argument that "the 2025 Policy 'sufficiently alters' the circumstances of this case" is wrongheaded. (Defs.' Mem. at 20). The controlling legal question is whether SRAA's rejection of the Firm's Ad and its shifting, pretextual justifications constituted viewpoint discrimination.

The 2025 Policy, adopted under the shadow of litigation, is nothing more than a post-hoc rationalization crafted to provide a veneer of legitimacy to its original, unconstitutional decision. Notably, SRAA has not reversed its decision to allow the Ad. SRAA cannot be permitted to rewrite history. The Firm's rights were violated by SRAA's actions in August 2025 when there was no mention of an Advertising Policy, and it is

that conduct that is before this Court.

SRAA states the "Firm does not and cannot point to any advertisement, past or present, which represents a departure from the text of the Policy or the Authority's objectives." This circumvents the main legal issue in this case, whether the Airport's rejection of the Firm's Ad was unconstitutional. Moreover, the 2025 Policy was created in response to the Firm's Ad and as a way to reject the Firm's Ad while allowing all of the other advertisements at the Airport. Nonetheless, many of the existing advertisements are objectionable under the 2025 Policy as explained below:

1. The 2025 Policy does not allow Nudity, yet an advertisement from the Turning Stone depicts a woman who is clearly naked with partially exposed breasts in the bathtub.
2. The 2025 Policy does not allow "false, misleading, or deceptive" content. Yet other law firms purport to be the "best" and that they will "make things right."
3. The 2025 Policy does not allow for disparagement, yet the "window treatment" advertisement ridicules homes that are not updated.
4. The 2025 Policy does not allow for advertisements that are disruptive to Airport operations. SRAA argues that Plaintiff's advertisement is disruptive. By this logic, many of the advertisements could also disrupt Airport operations, including those for "sensitive topics" such as breast augmentation, male enhancement, and divorce.

The failure of the Authority to challenge these existing advertisements while refusing Plaintiff's advertisement is further evidence of viewpoint discrimination and that Plaintiff's Ad is being targeted. The Court should see the Airport's maneuver regarding the 2025 Policy for what it is, a bad-faith attempt to avoid accountability, and reject it.

## III.    THE REMAINING INJUNCTION FACTORS WEIGH DECISIVELY IN PLAINTIFF'S FAVOR.

Defendants' arguments on the remaining preliminary injunction factors are equally as unavailing. The loss of First Amendment freedoms constitutes per se irreparable harm, Plaintiff is experiencing real harm, the balance of hardships tips

decidedly in the Firm's favor, and the public interest is always served by enjoining unconstitutional government action.

First, Plaintiff has unquestionably demonstrated irreparable harm. It is black-letter law in the Second Circuit that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *N.Y. Mag. v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998). Similarly, the Supreme Court has held "the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427, U.S. 347, 347 (1976). While some circuits have questioned this holding, the Second Circuit was not one of them. As a result, Defendants' argument that this presumption is not automatic (Defs.' Mem. at 21) ignores well-established precedent and relies on case law from the Ninth Circuit, *Am. Freedom Defense Initiative v. King County*, 796 F3d 1165, 1172 [9th Cir 2015]), a case that is both "not controlling" or "persuasive" and simply inapplicable here where this issue has already been decided differently by this Circuit.

In the Second Circuit, because Plaintiff has demonstrated a clear likelihood of success on its First Amendment claim, the irreparable harm is established. SRAA's censorship is an ongoing constitutional violation, depriving the Firm of its right to speak and the public of its right to receive the Firm's message in the forum for which it contracted. Defendants' suggestion that the harm is minimal because the Firm can advertise elsewhere is an affront to the First Amendment. Moreover, Plaintiff has alleged real harm as explained *infra*. The availability of other channels does not excuse viewpoint discrimination in a designated public forum.

Second, the balance of hardships tips sharply in Plaintiff's favor. The Firm does suffer the concrete and ongoing injury of having its constitutional rights violated and being unable to reach its target audience in a key commercial location. Plaintiff is

undoubtedly missing the opportunity to connect with potential clients who are experiencing harassment or discrimination at work. It is likely that there are many victims who go through the Airport traveling with, to or from a boss who is sexually harassing them. This makes the Airport a unique and important location for the Firm's advertisement directed specifically at these victims, who are also deprived of the Firm's Ad. In direct contrast to SRAA's assertions, these wrongs cannot simply be remedied with monetary compensation. No one can put a price on the Firm's ability to serve each unique case, cases that it is currently missing because its Ad has been unjustly rejected.

By comparison, SRAA's claimed harms are speculative and self-inflicted. SRAA fears "disruption," "controversy," and the loss of other advertisers. (Defs.' Mem. at 23–24). Yet, it provides not a shred of evidence to demonstrate how this Ad could possibly cause such harm. (Thomas Decl., Ex. H). The only "harm" SRAA would suffer from an injunction is certain members of leadership *feeling* "attacked as a man."[2] Further and juxtapose to the SRAA's arguments, there has been significant public outcry that the Airport has rejected the Ad, with individuals threatening to circumvent the Airport and businesses considering pulling their advertisements.

Finally, granting the injunction is unequivocally in the public interest. The Second Circuit has repeatedly held that "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). The public has a profound interest in preventing government censorship and ensuring that public forums are not sanitized of messages that challenge the powerful or make some people uncomfortable. Moreover, the Firm's message, educating victims of sexual harassment about their legal rights, is itself a matter of significant public concern.

---

[2] By contrast, the Firm seeks to help women that don't just "feel" attacked in the workplace by sexual harassment, but are being attacked by perpetrators who think that harassment in the workplace "isn't a big deal" or is "harmless."

Enjoining SRAA's unconstitutional conduct serves the public interest in every respect.

Finally, because the requested relief would alter the status quo by compelling SRAA to display the advertisement, Plaintiff acknowledges it must meet the heightened standard for a mandatory injunction by demonstrating a clear or substantial likelihood of success on the merits. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1024-25 (2d. Cir. 1985). As demonstrated at length above, Plaintiff has met this heavy burden. The evidence of viewpoint discrimination is not merely likely; it is overwhelming. SRAA's own declarations admit the initial rejection was based on a gendered reaction to the message. Its subsequent justifications are a transparent and clumsy pretext. Its attempt to moot the case with a post-litigation policy change is legally indefensible. On this record, Plaintiff has made a "clear showing that the moving party is entitled to the relief requested," and the mandatory injunction should issue to vindicate a blatant and ongoing constitutional violation. *Id.*

## <u>CONCLUSION</u>

For the foregoing reasons, and because Defendants' opposition is based on pretextual, post-hoc rationalizations that cannot excuse its blatant viewpoint discrimination, Plaintiff Megan Thomas Law, PLLC respectfully requests that this Court grant its Motion for a Preliminary Injunction. Plaintiff further requests that the Court issue a Mandatory Injunction compelling Defendant Syracuse Regional Airport

Authority to immediately install and display Plaintiff's contracted advertisement, and

grant any and all further relief as this Court deems just and proper.

**Dated**: September 25, 2025

Respectfully submitted,

***/s/ Megan K. Thomas, Esq.***
Megan K. Thomas, Esq.
(Bar Roll #5573217)
MEGAN THOMAS LAW, PLLC
*Pro se Plaintiff*
220 South Warren Street, 10th Floor
Syracuse, NY 13202
T: 315-999-1491
megant@mkt-law.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on September 25, 2025, the foregoing PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION was filed with the Court's ECF system, which will send electronic notice to all counsel of record.

<u>**/s/ Megan K. Thomas, Esq.**</u>
Megan K. Thomas, Esq.
*Pro se*