**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

MEGAN THOMAS LAW, PLLC,


                    Plaintiff,


        -v-                                          5:25-CV-01114 (AJB/ML)

SYRACUSE REGIONAL AIRPORT
AUTHORITY, JASON MEHL, and JASON
TERRERI


                    Defendants.
_____

**APPEARANCES:**                              **OF COUNSEL:**

MEGAN THOMAS LAW, PLLC                 MEGAN KATHERINE THOMAS, ESQ.
Attorneys for Plaintiff

HANCOCK ESTABROOK, LLP                 LINDSEY H. HAZELTON, ESQ.
Attorneys for Defendants               JOHN T. MCCANN, ESQ.

KAPLAN KIRSCH LLP                      STEVEN L. OSIT, ESQ.
Attorneys for Defendants               SUBASH S. IYER, ESQ.


**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION & ORDER

### I.     INTRODUCTION

This matter is before the Court on plaintiff's motion for preliminary injunction (Dkt. No. 8) and defendants' motion to dismiss (Dkt. No. 25).  For the reasons below, plaintiff's motion will be **GRANTED,** and defendants' motion will be **DENIED**.

### II.     BACKGROUND

Plaintiff Megan Thomas Law, PLLC ("Thomas" or the "Firm") is an employment law firm.  Compl., Dkt. No. 1 at 2.  It represents workers facing discrimination and sexual harassment.  *Id.*  Defendant Syracuse Regional Airport Authority ("SRAA") is a public benefit corporation that operates the Syracuse Hancock International Airport; defendant Jason Terreri is the SRAA's Chief Executive Officer, and defendant Jason Mehl is its Chief Commercial Officer (collectively, the "Authority").[1]  Defs.' Resp. to Mot. for Prelim. Inj., Dkt. No. 20 at 8; Mehl Decl., Dkt. No. 20-2 ¶ 1; Dkt. No. 20 at 5; Defs.' Mot. to Dismiss, Dkt. No. 25-1 at 5.  The Authority earns money by selling space for advertisements.  Dkt. No. 1 at 8; Dkt. No. 20 at 5.

In late June 2025, Thomas emailed the Authority, expressing interest in advertising at the airport.  Dkt. No. 1 at 14; Dkt. No. 20 at 7; *see* Compl., Ex. A, Dkt. No. 1-1 at 1 ("I run an employment law firm geared towards employees facing a multitude of issues in the workplace, including discrimination and harassment.  I am interested in putting up a billboard at the airport.  Could you please give me a call to discuss?").

---

[1] The Court refers to defendants SRAA, Mehl, and Terreri collectively as "the Authority," following defendants' convention in their filings.  *See, e.g.*, Defs.' Resp. to Mot. for Prelim. Inj., Dkt. No. 20 at 5.  Where necessary to refer only to the Syracuse Regional Airport Authority, the Court uses the term "SRAA."

In mid-July, following a tour of the space, the parties contracted to display an advertisement of the Firm's for six months, to begin August 1, 2025.  *See* Dkt. No. 1 at 11–13; Compl., Ex. C, Advertising Agreement, Dkt. No. 1-3.

Advertisers are to follow the Authority's ad policy.  At the outset of this dispute, that policy was brief: It prohibited ads that were "inappropriate, immoral, offensive, or objectionable" and those with "political [or] religious messages."  Defs.' Resp. to Mot. for Prelim. Inj., Ex. B, Dkt. No. 20-15 at 4 (2023 advertising policy).

The Authority claims plaintiff's proposed ad, shown below, broke these rules.



Dkt. No. 1 at 2.

According to the Authority, "[t]he majority of the Firm's ad was acceptable[.]"  Dkt. No. 20-2 ¶ 13.  "[W]e had no concerns with listing the legal services that the Firm provides, including for sexual harassment and no objection to the proposed ad's other content, including the tag line 'No Fear, No Shame, Just Justice,' or any of the Firm's web-based content . . . linked through display of a QR code."  *Id.*  "Specifically problematic was its tag line—'When HR called it harmless flirting . . . We call it EXHIBIT A.' and the potential for disruption presented by this type of accusatory and inaccurate statement."  Dkt. No. 20-2 ¶ 12.

Hence, the Authority refused to display the ad.  Plaintiff says the ad did not violate any policy; rather, the Authority's contrary assertions were, and continue to be, simply cover for unconstitutional censorship.

As a result, plaintiff filed this action on August 15, 2025, alleging breach of contract and, in six counts, violations of the First, Fifth, and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983.  Dkt. No. 1.[2]  On August 29, plaintiff moved for a preliminary injunction. Dkt. No. 8.

Two weeks later, on September 12, the Authority changed its ad policy.  Defs.' Resp. to Mot. for Prelim. Inj., Ex. C, Dkt. No. 20-16 at 2 (2025 advertising policy).  It now lists fourteen types of prohibited content.  *Id.* at 5–6.  These include, for example, ads for tobacco and marijuana, ads with profanity, and ads that "disparage[]" or are "false, misleading, or deceptive." *Id.* at 6.

On September 16, the Authority sent the Firm a letter.  *See* Defs.' Resp. to Mot. for Prelim. Inj., Ex. E, Dkt. No. 20-18.  It had reconsidered the Firm's ad and rejected it once more:

> The Authority has determined that it must reject the proposed advertising copy as Prohibited Advertising Content under the Policy because the tag

---

[2] Count I alleges violation of the First Amendment on the theory that the Authority operates a 'designated public forum' and has unconstitutionally discriminated against plaintiff because of the ad's content.  Dkt. No. 1 at 19–21.  Alternatively, under Count I, plaintiff alleges that the Authority operates a 'limited' or 'nonpublic' forum, and that it has unconstitutionally discriminated against plaintiff based on viewpoint.  *Id.*  Count II makes the same allegations; however, it is repackaged as a First Amendment retaliation claim.  *Id.* at 21–23.

In Count III, the Firm asserts a First and Fourteenth Amendment claim for 'gender discrimination.'  *Id.* 23–25.  Count IV asserts a Fourteenth Amendment equal protection claim; Count V, a substantive due process violation under both the Fifth and Fourteenth Amendment.  *Id.* at 25–32.  *But see Scott v. Romano*, 2025 WL 3455771, at *2 (W.D.N.Y. Nov. 26, 2025) ("It is well-established that 'the Fifth Amendment applies to and restricts only the Federal Government.'") (quoting *Griffin v. City of New York*, 880 F. Supp. 2d 384, 404 (E.D.N.Y. 2012)).

Count VI submits municipal liability as an independent claim for relief.  Dkt. No. 1 at 32–34.  *But see Jeffery v. City of New York*, 113 F.4th 176, 187 n.14 (2d Cir. 2024) ("There is no 'stand-alone cause of action' for 'municipal liability.'"), *cert. denied sub nom. Jeffery v. City of New York, New York*, 145 S. Ct. 1174, 221 L. Ed. 2d 253 (2025).

Plaintiff's final claim, Count VII, asserts breach of contract.  Dkt. No. 1 at 34–35.

> line – "When HR called it Harmless Flirting …We Called it Exhibit A" (the
> "Tag Line") – reasonably "disparages, demeans, ridicules, is abusive or
> hostile to, or reflects negatively on the character, integrity, or standing (or
> could reasonably be interpreted as such) of any individual, group, entity,
> business/profession, religion, organization, or governmental entity,
> including advertising that portrays such individuals, entities, or groups as
> inferior, evil, unlawful, objectionable, or contemptible." In addition and
> alternatively, the Tag Line "is false, misleading, or deceptive" Prohibited
> Advertising Content per the Policy as it references/implies the applicability
> of an incorrect, misleading and/or specious legal standard.

*Id.* at 2.

Less than a week after changing the ad policy, the Authority filed its response to the

Firm's motion for injunctive relief; and, on October 2, it filed a motion to dismiss under

Rule12(b)(1) and 12(b)(6). Dkt. No. 20; Dkt. No. 25. Both motions are fully briefed.

## III. STANDARDS OF REVIEW

### A. Preliminary Injunction Standard

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be

granted unless the movant, by a clear showing, carries the burden of persuasion." *State Farm*

*Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (internal

citations omitted). "To obtain a preliminary injunction, a party must show '(1) irreparable harm;

(2) either a likelihood of success on the merits or both serious questions on the merits and a

balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction

is in the public interest.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse,*

*P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer*

*Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

"[A]s a general matter, there is a presumption of irreparable harm when there is an

alleged deprivation of constitutional rights." *Matthews v. Barq*, 2019 WL 1025828, at *14

(N.D.N.Y. Mar. 4, 2019) (McAvoy, J.) (quoting *V.W. by & through Williams v. Conway*, 236 F.

Supp. 3d 554, 588 (N.D.N.Y. 2017)). However, "the favorable presumption of irreparable harm arises only after a plaintiff has shown a likelihood of success on the merits of the constitutional claim." *Brock v. City of New York*, 2022 WL 479256, at *4 (S.D.N.Y. Jan. 28, 2022) (citing *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)).

"In other words, 'because the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'" *A.H. by & through Hester v. French*, 511 F. Supp. 3d 482, 497 (D. Vt. 2021) (quoting *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)); *see also A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) ("In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm.").

"The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." *Deide v. Day*, 676 F. Supp. 3d 196, 232–33 (S.D.N.Y. 2023); *see also Millennium Pipeline Co., L.L.C. v. Seggos*, 288 F. Supp. 3d 530, 545 (N.D.N.Y. 2017) (D'Agostino, J.) (The government is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.").

Furthermore, "[i]t is always in the public interest to protect First Amendment liberties." *Robar v. Vill. of Potsdam Bd. of Trs.*, 490 F. Supp. 3d 546, 574 (N.D.N.Y. 2020) (Kahn, J.) (collecting cases). Ergo, here, the "[l]ikelihood of success on the merits is . . . 'the dominant, if

not the dispositive, factor.'" *A.H. by & through Hester*, 985 F.3d at 176 (quoting *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

### B. Merits of Constitutional Claims

### 1. First Amendment Principles

"The first issue to be addressed in any challenge to the constitutional validity of a rule under the First Amendment is whether a First Amendment right exists, for if it does not, we need go no further." *Potanovic v. Town of Stony Point*, 651 F. Supp. 3d 677, 682 (S.D.N.Y. 2023), *aff'd,* 2024 WL 3159221 (2d Cir. June 25, 2024). "Thus, '[i]n evaluating § 1983 claims for First Amendment violations, courts first inquire whether the activity in question is protected . . . under the First Amendment." *Potanovic*, 651 F. Supp. 3d at 682 (quoting *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 505 (S.D.N.Y. 2013)).

Plaintiff's ad plainly qualifies as protected speech. "Lawyer advertising is commercial speech that is protected by the First Amendment." *Hayes v. Zakia*, 2002 WL 31207463, at *3 (W.D.N.Y. Sept. 17, 2002) (citing *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995)); *see also Eastchester Tobacco & Vape Inc. v. Town of Eastchester*, 618 F. Supp. 3d 155, 162 (S.D.N.Y. 2022) ("Commercial speech, such as advertising, is . . . protected by the First Amendment, and government regulations of commercial speech are subject to heightened scrutiny.") (citing *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 637–38 (1985)).

"To determine whether the First Amendment protects particular speech"—in this instance, plaintiff's ad—the Court "must first 'examine the nature of the forum in which the speaker's speech is restricted.'" *Young Am.'s Found. v. Stenger*, 2021 WL 3738005, at *10 (N.D.N.Y. Aug. 24, 2021) (quoting *Huminski v. Corsones*, 396 F.3d 53, 89 (2d Cir. 2005)). "The Court must then assess whether the justifications for exclusion from the relevant forum

satisfy the requisite standard." *Young America's Foundation*, 2021 WL 3738005, at *10 (citing

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

### 2. Forum Analysis

"Although the First Amendment extends its protection to certain forms of speech or

expressive activity, '[e]ven protected speech is not equally permissible in all places and at all

times.'" *Caractor v. City of New York Dep't of Homeless Servs.*, 2013 WL 2922436, at *5

(S.D.N.Y. June 14, 2013) (quoting *Cornelius*, 473 U.S. at 799). "As a general matter, the

government is permitted to exercise control over the public's use of government-owned property

for expressive purposes, and the degree of control permitted depends upon the nature of the

property and the speech restrictions imposed thereon." *Mallett v. Town of Huntington*, 799 F.

Supp. 3d 117, 125 (E.D.N.Y. 2025) (quoting *Hotel Emps. & Rest. Emps. Union, Loc. 100 v. City

of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 544 (2d Cir. 2002)).

Such restrictions "are analyzed under a 'forum-based' approach that divides government

property into three principal categories—the traditional public forum, the designated public

forum, and the nonpublic forum, along with a subset of the designated public forum, referred to

as the limited public forum." *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017) (cleaned up).

Traditional public fora, "such as . . . sidewalks and public ways[,] 'are areas that have

historically been open to the public for speech activities.'" *Vitagliano v. Cnty. of Westchester*,

71 F.4th 130, 137 (2d Cir. 2023) (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)).

Designated public fora are places "that, although not traditionally open for public

assembly and debate, the government has taken affirmative steps to open for general public

discourse." *Chinese Am. Citizens All. Greater New York v. New York City Dep't of Educ.*, 2025

WL 2753551, at *16 (S.D.N.Y. Sept. 29, 2025) (quoting *Johnson*, 859 F.3d at 172).

"Nonpublic fora are neither traditionally open to public expression nor designated for such expression by the State." *Women for Am. First v. de Blasio*, 520 F. Supp. 3d 532, 547 (S.D.N.Y. 2021), *aff'd sub nom. Women for Am. First v. Adams*, 2022 WL 1714896 (2d Cir. May 27, 2022) (internal citations omitted).  "Examples of nonpublic fora include airport terminals, government-owned professional sports stadiums, military bases and restricted access military stores, and jailhouse grounds." *Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, 992 F. Supp. 2d 102, 117 (N.D.N.Y. 2014) (D'Agostino, J.) (citing *Hotel Emps. & Rest. Emps. Union*, 311 F.3d at 546 ).

Limited public fora are those that the government has "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Vidal v. Elster*, 602 U.S. 286, 309 (2024) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)).  These are "often analyzed as a subset of the designated public forum and as a nonpublic forum opened up for specific purposes." *Endemann v. City of Oneida, New York*, 2020 WL 1674255, at *5 (N.D.N.Y. Apr. 6, 2020) (D'Agostino, J).  "Common examples of limited public fora include state university meeting facilities opened for student groups, open school board meetings, city-leased theaters, and subway platforms opened to charitable solicitations." *Wandering Dago Inc.*, 992 F. Supp. 2d at 117 (internal citations and alterations omitted).

"In a traditional or designated public forum, content-based regulations are presumptively invalid." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 474 (S.D.N.Y. 2012) (internal citations omitted).  "In these fora, content-based restrictions will be upheld only if they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end." *Thomas v. Town of Hempstead*, 2021 WL 2291838, at *8 (E.D.N.Y. June 4,

2021) (quoting *Peck ex rel. v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625–26 (2d Cir. 2005)).

However, in a limited public forum or nonpublic forum, "regulations governing the content of speech are allowed, so long as they are reasonable and viewpoint-neutral." *Johnson*, 859 F.3d at 172 (internal citations omitted); *see Am. Freedom Def. Initiative*, 880 F. Supp. 2d at 470 n.6.

"[F]orum analysis is not completed merely by identifying the government property at issue." *Cornelius*, 473 U.S. at 801. "Rather, in defining the forum we . . . focus[] on the access sought by the speaker." *Id.* Because plaintiff "sought access to the advertising space and not to the airport as a whole, the advertising space is the proper focus of forum analysis." *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1152 (7th Cir. 1995); *see, e.g.*, *New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998) (finding relevant forum to be advertising space on exterior of MTA buses); *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 651 (9th Cir. 2019) (conducting forum analysis of transit authority's advertising program); *U.S. Sw. Afr./Namibia Trade & Cultural Council v. United States*, 708 F.2d 760, 765 (D.C. Cir. 1983) ("[T]he commercial advertising displays . . . constitute a separate forum for expression from the remainder of the [airport] terminal.").

When determining the type of forum at issue, we "look[] to the government's intent for the forum, as evidenced by the 'policy and practice of the government.'" *Reyes v. City of N.Y.*, 2023 WL 7212192, at *8 (S.D.N.Y. Nov. 2, 2023) (quoting *Cornelius*, 473 U.S. at 802). Courts have "also examined the nature of the property and its compatibility with expressive activity to discern the government's intent." *Cornelius*, 473 U.S. at 802. Some circuits, for instance, "have

deemed public transit advertising facilities nonpublic fora where the transit authority's policy limits advertising facilities to commercial speech, and/or the authority had consistently rejected non-commercial submissions that addressed political or civic issues." *Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 590 (1st Cir. 2015) (Stahl, J., concurring in part).

"By contrast, other circuits have considered controversial advertisements in the context of public transportation systems and rightly concluded that when public transit facilities open themselves up to a variety of non-commercial speech, those facilities become designated public fora for members of the public to opine, discuss, and comment upon the civic and political issues of the day." *Id.* at 590–91; *see also Am. Freedom Def. Initiative v. King Cnty., Wash.*, 577 U.S. 1202 (2016) (Thomas, J., dissenting from denial of certiorari) ("[M]any transit authorities have . . . opened their advertising spaces to a wide array of political speech, and courts of appeals are divided on what type of forum this creates. Transit authorities in Chicago, Detroit, New York City, and Washington, D.C., are bound by rulings that classify their ad spaces as designated public forums and, thus, prohibit content-based restrictions on advertising. Transit authorities in Boston . . . and . . . Seattle . . . are similarly open to political speech, yet can freely restrict speech based on its content. Whether public transit advertising spaces are designated or limited public forums determines what speech millions of Americans will—or will not—encounter during their commutes.").

In this instance, as in most, "[i]t is clear that the forum analysis that the Court must undertake is . . . fact intensive." *Wandering Dago Inc.*, 992 F. Supp. 2d at 123 (citing *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 343 (2d Cir. 2010)); *see Zalaski*, 613 F.3d at 343 (expressing "serious concerns about the forum analysis . . . conducted by the district court[,]

[e]specially in light of the sparse record").  At this juncture, the Court believes it is premature to classify the forum.

Nevertheless, concluding the forum designation now is unnecessary.  Even under the standards applicable to a nonpublic forum, plaintiff has sufficiently established a likelihood of success on the merits.

## IV. DISCUSSION

The Court will first consider the 2025 policy, revised while plaintiff's motion for preliminary injunction was pending, because it lends itself more readily to legal analysis and is now in effect.  It will then consider the 2023 policy, which governed during most of the relevant events.  Finally, it will consider the Authority's argument that the revision moots plaintiff's request for injunctive relief.

For purposes of resolving this motion, the Court assumes the Authority's advertising program is a nonpublic forum.  Consequently, the Authority's rejection must be "reasonable in light of the purpose served by the forum and . . . viewpoint neutral.'"  *Byrne v. Rutledge*, 623 F.3d 46, 54 (2d Cir. 2010) (quoting *Cornelius*, 473 U.S. at 806).

### A. Current Advertising Policy

The Authority's renewed rejection purportedly rested on two standards of the revised policy that the ad violates: disparagement and falsity.  *See* Dkt. No. 20-18 at 2.

### 1. Falsity Clause

The revised policy's falsity clause states that the Authority will reject any ad that is:

> 9. *False, Misleading, or Deceptive.* Advertising that is false, misleading, or deceptive.

Dkt. No. 20-16 at 6 (2025 advertising policy).

The clause appears constitutional on its face.  *See Am. Freedom Def. Initiative v. King Cnty.*, 796 F.3d 1165, 1171 (9th Cir. 2015) ("[M]etro's rejection of the ad on the ground of falsity likely was reasonable and viewpoint neutral."); *but see id.* at 1171–72 ("[W]e emphasize the limited nature of our holding, which applies only to objectively and demonstrably false statements where the circumstances of the case do not give rise to an inference of unreasonableness or viewpoint-based discrimination."); *id.* at 1172 ("In that regard, we note that a hypothetical rejection of an ad for a *trivial* inaccuracy might give rise to an inference that the rejection was, in fact, unreasonable or viewpoint-based.").

However, the problem lies in how the clause applies here.  The Authority argues that plaintiff's ad—more precisely, the tagline 'When HR called it Harmless Flirting . . . We called it Exhibit A' (*see* Dkt. No. 1 at 2)—violates the falsity provision:  "[T]he Tag Line 'is false, misleading, or deceptive' Prohibited Advertising Content per the Policy as it references/implies the applicability of an incorrect, misleading and/or specious legal standard."  *See* Dkt. No. 20-18 at 2.  According to the Authority, "[t]he proposed slogan falsely implies that conduct considered to be 'harmless flirting' is necessarily actionable harassment."  Dkt. No. 20 at 24 n.9.

That is nonsense.

The tagline does not claim, suggest, or "falsely impl[y]" any such position—at least, no more than Chick-fil-A's Authority-approved tagline "falsely implies" that chicken dinners will always make a person happy, or that cows can speak, *see* Dkt. No. 20-3 at 25 ("Chikin 4 Din Makez U Grin"), Clarkson University's claims that space travel is impossible, *see id.* at 31 ("The sky's the limit"), or Syracuse University's advocates for the battering of North Carolinians, *see* Dkt. No. 20-5 at 6 ("Take Down the Tar Heels").

At most, plaintiff's tagline suggests there are situations where conduct labeled "harmless flirting" could be, or might have been, actionable harassment.  No reasonable person could believe plaintiff is saying use of the term "harmless flirting" automatically grants any plaintiff a valid legal claim.

The Authority's application of the falsity clause to plaintiff was plainly unreasonable.

**2. Disparagement Clause**

Because the Authority also rejected the ad under the revised policy on the grounds of disparagement, the Court next turns to that provision:

> 6. *Disparagement.* Advertising that disparages, demeans, ridicules, is abusive or hostile to, or reflects negatively on the character, integrity, or standing (or could reasonably be interpreted as such) of any individual, group, entity, business/profession, religion, organization, or governmental entity, including advertising that portrays such individuals, entities, or groups as inferior, evil, unlawful, objectionable or contemptible.

Dkt. No. 20-16 at 6.

In *Matal v. Tam*, the Supreme Court considered a federal statute that barred registration of trademarks "which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."  582 U.S. 218, 227 (2017).  The Court held the provision unconstitutional, explaining it violated the Free Speech Clause, as "[s]peech may not be banned on the ground that it expresses ideas that offend."  *Id.* at 223 (Alito, J., majority op.)

Finding *Matal* compelling, courts have since applied its reasoning to transit authorities that prohibit ads under similar restrictions.  *See Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 498 (6th Cir. 2020) ("SMART alternatively rejected AFDI's fatwa ad under a restriction prohibiting ads that could hold a group of people up

to 'scorn or ridicule.' *Matal* shows that this rationale has a free-speech problem of its own: It discriminates on the basis of viewpoint.") (citing Justice Alito's plurality opinion, 137 S. Ct. 1744, 1763, and Justice Kennedy's concurrence in part and in judgment, *id.* at 1766); *Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1131 (9th Cir. 2018) ("Applying the Supreme Court's decision in *Matal*, we conclude that [the public transit authority's] disparagement standard discriminates, on its face, on the basis of viewpoint."); *P.E.T.A., Inc. v. Shore Transit*, 580 F. Supp. 3d 183, 196–97 (D. Md. 2022) ("Here, the prohibition on advertisements that are 'controversial, offensive, objectionable or in poor taste' is likewise viewpoint discriminatory[;] [t]hese terms seem to prohibit the same thing: advertisements that Defendants find offensive in some way.");  *Cf. Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) ("Wherever one might draw the line between expressions of 'viewpoint' and other categories of speech content in a different context, *Matal* is clear that '[g]iving offense is a viewpoint'[—]at least when giving 'offense' to an audience is the sole effect that the government is targeting.") (quoting Justice Alito's plurality opinion, 137 S. Ct. at 1763, and citing Justice Kennedy's concurrence in part and in judgment, *id.* at 1766).

Similarly, the Authority's disparagement clause "discriminates, on its face, on the basis of viewpoint."  *See American Freedom Defense Initiative*, 904 F.3d at 1133.

The instant case justifies *Matal*'s uncompromising rule.  In the best of situations, a government actor can clearly explain why it believes speech it seeks to restrict to be disparaging.  *See Matal*, 582 U.S. at 223 (USPTO denied "dance-rock band's application for . . . trademark . . . of the band's name, 'The Slants[,]' [as] 'Slants' is a derogatory term for persons of Asian descent"); *Wandering Dago*, 879 F.3d 20 at 24 (state officials denied operator's application to food service program because brand used language widely seen as an ethnic slur).

That is not true here.  Instead, the Authority repeatedly throws around the label "disparaging," yet says little about why, how, or of whom.

Plaintiff asserts that the Authority gave it several incongruent bases for rejection: The ad "may 'intimidate' or 'threaten' men," "sexual harassment is a sensitive topic," it "denigrates HR departments," "local politicians . . . might not like the [a]d," and so on.  *See* Dkt. No. 20 at 21–22 (internal citations omitted).  The Authority, seeming to concede the veracity of plaintiff's representations, asserts that "these statements address[] the same core point: [the ad] contained . . . disparaging language that would risk alienating *some* segment of the traveling public and other Airport users."  *Id.* at 22 (emphasis in original).

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Matal*, 582 U.S. at 244 (quoting *Texas v. Johnson,* 491 U.S. 397, 414 (1989) and collecting cases).  This holds when the government mirrors a majoritarian view.  It is firmer still when the government appoints itself society's conscience, and that conscience is nothing but the censoring officials' own.

"To be sure, the clause evenhandedly prohibits disparagement of all groups[:] It applies equally to marks"—or, in this case, advertisements—"that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue[.]"  *Matal*, 582 U.S. at 243 (Alito, J., plurality op.).  "But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint."  *Id.*

It is clear to the Court that the disparagement clause is facially invalid; thus, it "cannot serve as a constitutionally valid basis for [the] rejecti[on]" of the Firm's ad.[3]  *See Am. Freedom Def. Initiative*, 904 F.3d at 1133.

---

[3] The Court acknowledges that at least one lower court has questioned the applicability of *Matal* to circumstances beyond trademark registration.

For example, in *Moms for Liberty - Brevard Cnty., FL v. Brevard Pub. Schs.* ("*MFL*") a district court considered whether a board policy that allowed an official to "interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant" and "request any individual to leave [a] meeting when that person does not observe reasonable decorum" violated the First Amendment.  582 F. Supp. 3d 1214, 1217–18 (M.D. Fla. 2022), *aff'd*, 2022 WL 17091924 (11th Cir. Nov. 21, 2022).

After holding that "prohibiting abusive and obscene comments is not based on content or viewpoint, but rather is critical to prevent disruption, preserve 'reasonable decorum,' and facilitate an orderly meeting[,]" *id.* at 1219, the *MFL* court appraised *Matal*:

> Plaintiffs' argument to the contrary barely warrants mention, as it is based on wholly inapposite and unpersuasive out-of-Circuit cases that directly conflict with binding and persuasive Eleventh-Circuit authority. (*See* Doc. 3, pp. 14–15; Doc. 18); *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887 (6th Cir. 2021); *Marshall v. Amuso*, No. 21-4336, 571 F. Supp. 3d 412 (E.D. Pa. Nov. 17, 2021). Both of Plaintiffs' cited cases held that policies restricting abusive and personally directed speech were viewpoint-discriminatory, relying on *Matal v. Tam*, ⸻ U.S. ⸻, 137 S. Ct. 1744, 198 L.Ed.2d 366 (2017). *See Ison*, 3 F.4th at 893–94; *Marshall*, 571 F.Supp.3d at 420–26. But these cases fundamentally misapprehend *Matal*. Both holdings rely on this quote: "Giving offense is a viewpoint." 137 S. Ct. at 1763 (Alito, J., plurality op.); *see also Ison*, 3 F.4th at 894; *Marshall*, 571 F. Supp. 3d at 420–21. But that quotation comes from Part III.B. of the plurality opinion, not the opinion of the Court (a fact that *Ison* simply gets wrong when noting "all justices agreed that the 'anti-disparagement' clause discriminated based on viewpoint because '[g]iving offense is a viewpoint,' " *see* 3 F.4th at 894), so it is not binding. The full Court held only that a provision in the Lanham Act preventing private disparaging speech in the registration of trademarks was unconstitutional. *See Matal*, 137 S. Ct. at 1757–61 (Alito, J., majority op.). So the Court's opinion in *Matal* has no bearing on this case, which is about public speech in a limited public forum in a completely different context; as such, Plaintiffs' cases' reliance on *Matal* is misplaced.

*Moms for Liberty*, 582 F. Supp. 3d at 1220 n.8.

On this point of contention, the Ninth Circuit offers helpful clarification:

> [*Matal*] held unanimously that the disparagement clause is facially invalid under the Free Speech Clause of the First Amendment. Two four-Justice opinions characterized some of the sub-issues differently. But all eight Justices (Justice Gorsuch was recused) held that offensive speech is, itself, a viewpoint and that the government engages in viewpoint discrimination when it suppresses speech on the ground that the speech offends. *See, e.g.*, *id.* at 1751 (plurality) ("[T]his provision violates the Free Speech Clause of the First Amendment. It offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend."); *id.* at 1763 (plurality) ("Giving offense is a viewpoint."); *id.* at 1766 (Kennedy, J., concurring) ("Within that category [of persons and other things described in the statute], an applicant may register a positive or benign mark but not a derogatory one. The law thus reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination.").

In sum, the Authority gave two reasons under the revised policy for the ad's rejection: disparagement and falsity. Neither holds water. On these bases, the refusal to display the ad under the revised policy is viewpoint-based and unreasonable.[4]

**B. Prior Advertising Policy**

The same conclusion applies, even if the former 2023 policy governed.[5]

The Court notes briefly that the Authority never identifies which provision(s) of that scanty policy plaintiff allegedly violated. Instead, when invoked, the Authority only gestures broadly at it. *See, e.g.*, Pl.'s Mot. for Prelim. Inj., Ex. G, Terreri Rejection Letter, Dkt. No. 8-8 at 1. ("The Advertising Policy prohibits 'material which the SRAA deems inappropriate, immoral, offensive, or objectionable' and bars '[p]olitical and religious messages.' While the Authority remains willing to work with your law firm in good faith to identify an appropriate advertisement for your firm's services, we cannot accept the advertisement copy for display in its current form. There are two independent aspects of your proposed copy that risk interfering with the efficient operation of the terminal[:] First[,] language suggesting that any group should face liability and be subject to lawsuit risks creating an atmosphere in which passengers and tenants do not feel

---

*Am. Freedom Def. Initiative*, 904 F.3d at 1131.

This Court agrees that the plurality opinion is not binding. But it finds the reasoning in *Matal*, and its use in similar cases, highly persuasive, if not compelling. Whatever the *MFL* court believed about *Matal*'s relevance under the facts of that case, this Court sees "[n]o material textual difference distinguishes [the Authority's] disparagement clause from the trademark provision at issue in *Matal*." *Am. Freedom Def. Initiative*, 904 F.3d at 1131.

[4] "Because the restriction is viewpoint discriminatory, [the Court] need not decide whether it is unreasonable in light of the purposes served by the forum." *American Freedom Defense Initiative*, 904 F.3d at 1133 n.3 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001)).

[5] *See* Dkt. No. 20-15 ("Advertisements shall not contain material which the SRAA deems inappropriate, immoral, offensive, or objectionable. Political and religious messages are not allowed. Advertiser/Agency warrants that the advertisement does not contain any material that shall infringe or violate any copyright, trademark or any other personal or proprietary right of any person/entity or render the SRAA liable to any claims or proceedings whatsoever. The advertisement must comply with all federal, state, and local laws and regulations. The SRAA has the right to deny signage for any reason.").

welcome[;] [s]econd[,] using language commonly connected with sensitive topics such as sexual harassment risks creating an atmosphere in which a broad range of passengers, both adults and children, are exposed to highly charged topics when proceeding through the Airport, thereby undermining the principal commercial purposes of airports[.]").

Nevertheless, none of the provisions that might justify refusing the ad is constitutional. The former advertising policy barred content the Authority deemed "inappropriate," "offensive," or "objectionable"—restrictions that are, as discussed above, unconstitutional considering *Matal*. The Authority's ban on "immoral" content fares no better. In *Iancu v. Brunetti*, 588 U.S. 388 (2019), the Supreme Court invalidated a federal statute barring registration of "immoral [or] scandalous" trademarks because it disfavored certain ideas in violation of the First Amendment. *See Iancu*, 588 U.S. at 392–99; *see also e.g.*, *P.E.T.A., Inc.*, 580 F. Supp. 3d at 196 ("Applying *Matal* and *Iancu*, courts have struck down public transit system policies that drew similar morality-based distinctions."). And at no point has the Authority claimed that plaintiff's ad was "political" or "religious." No reasonable reading could place it in the religious category. As for the political category, even had the Authority argued plaintiff's ad was political, the prior policy's ban on "political messages"—a term neither the policy nor the Authority defines or explains—appears wholly incapable of reasoned application. *See Minnesota Voters All. v. Mansky*, 585 U.S. 1, 16–23 (2018).

All of this is aside from the litany of dubious rationales and post hoc justifications offered by the Authority, some so questionable that one wonders how seriously it expects plaintiff or the Court to take them. *Compare* Dkt. No. 8-8 at 2 ("Second, irrespective of the viewpoint you are expressing, using language commonly connected with sensitive topics such as sexual harassment risks creating an atmosphere in which a broad range of passengers . . . are exposed to highly

charged topics when proceeding through the Airport, thereby undermining the principal commercial purposes of airports—processing and serving air travelers efficiently, and providing them a rapid, convenient, pleasant experience."), *with id.* ("As we have noted repeatedly, the Authority has no concerns with listing the legal services that your firm provides, including for sexual harassment[.]"); *see also e.g.*, Dkt. No. 20 at 19 ("Indeed, the *only* 'viewpoint' that could *possibly* be expressed by the tag line . . . is that HR departments are inherently protective of sexual harassers or that bosses are inherently 'creepy.'") (emphasis added).

It is evident that the Authority's refusal to display the ad under the 2023 policy was also viewpoint-based and unreasonable.

### C. Mootness

While the preliminary injunction motion was pending before the Court, the Authority revised its policy—and, in doing, it says, negated any reason to grant injunctive relief, as the rejection plaintiff complains of was made purportedly under the prior 2023 policy. *See* Dkt. No. 20 at 23–24.

"Of course, a plaintiff's claims will not be found moot where the defendant's amendments are merely superficial or the law, after amendment, suffers from similar infirmities as it did at the outset." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 109 F. Supp. 3d 626, 631 (S.D.N.Y. 2015), *aff'd,* 815 F.3d 105 (2d Cir. 2016) (quoting *Lamar Advert. of Penn., LLC v. Town of Orchard Park, New York*, 356 F.3d 365, 378 (2d Cir. 2004)). "[D]efendants bear a 'heavy burden' in showing that the plaintiff['s] claims for injunctive relief have become moot." *American Freedom Defense Initiative*, 109 F. Supp. 3d at 629 (citing *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). "The voluntary cessation of allegedly illegal conduct usually will render a case moot if the defendant[s] can demonstrate that

(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *American Freedom Defense Initiative*, 109 F. Supp. 3d at 630 (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002)).

The Authority's rejection under the revised 2025 policy, it believes, "sufficiently alters" the circumstances of this case to warrant denial of injunctive relief. *Id.* at 23. Yet, it also insists, "[t]o be clear, the Authority's rejection of the Firm's proposed advertising has always been based on the disparaging nature of its tag line[.]" *Id.* at 24. To boot, the Authority stresses that—from get-go—it has found the tag line's "inaccurate statement" to be "[s]pecifically problematic[.]" Dkt. No. 20-2 ¶ 12; *see also* Dkt. No. 20 at 5 ("Fearing that this sort of advertising copy could undermine the Authority's advertising program[,] the Authority offered to display . . . any number of alternative tag lines . . . that conveyed a similar message in a . . . less misleading and disparaging manner. Rather than work with the Authority, however, the Firm filed this lawsuit."). Still, seemingly in the same breath, the Authority treats the tagline's "incorrect or misleading" nature as a new rejection rationale—so new, apparently, that plaintiff's complaint must be amended to address it. *See* Defs.' Resp. to Mot. for Prelim. Inj., Dkt. No. 20 at 24 n.9 ("While the Firm might seek to amend its complaint to challenge the Authority's more recent rejection of the advertisement as incorrect or misleading, *see* Mehl Decl. Ex. E, the Authority notes that this, too, is a reasonable basis to reject the advertisement.").

The Authority's position stated baldly: heads we win, tails, plaintiff loses.

Certainly, the Authority is entitled to revise its policy. But the suspect timing and the fact that its renewed rejection rests on the same grounds under both policies only underscore that the request for injunctive relief is not moot. *Compare Sw. Airlines Pilots' Ass'n v. City of Chicago*,

186 F. Supp. 3d 836, 840–41 (N.D. Ill. 2016) ("Recognizing that it could not change its policy in relation to just that one ad, the [airport], correctly and professionally, chose to explore other policies in other cities that had been approved by Courts and regrouped to draft such a policy."); *id.* at 841 ("The [airport] was entitled to change how it sought to use its advertising space and there is nothing in the record indicating this change was contrived to provide a post hoc rationale for an existing advertisement.") *with* Defs.' Resp. to Mot. for Prelim. Inj., Dkt. No. 20 at 8 ("The Authority's experience with the Firm revealed a need to provide prospective advertisers with additional guidance regarding advertising content that would be acceptable to the Authority. Accordingly, the Authority adopted a revised Advertising Policy[.]").

The Authority's refusal to display the ad was viewpoint-based and unreasonable. Plaintiff has established a substantial likelihood of success on the merits.

### D. Appropriate Relief

Having established that plaintiff is entitled to relief at the preliminary injunction stage, the Court must next determine what relief is appropriate. In its motion for preliminary injunction, plaintiff asks the Court to post its ad immediately pursuant to the terms of the parties' agreement. Dkt. No. 8-14 at 7.

Undoubtedly, this is an option. It may even be the most appropriate one. Another, though, might be to allow the Authority a chance to revise its policy again, excise the constitutional infirmities identified by this opinion (and any others it might discover), and reconsider plaintiff's ad with a fresh perspective. And, of course, there may well be other legitimate outcomes that remedy the violations here.

The Court acknowledges that the parties have already addressed the issue in their briefs, but only to a minor extent, and in largely binary terms: whether relief was warranted, not what

22

form it should take.  Nonetheless, now that the Court has deemed injunctive relief appropriate, it will give the parties an opportunity to address this issue more fully before specifying what preliminary injunctive relief it will order.  The parties are directed to submit to the Court their positions, along with appropriate authority, on the proper relief in the present situation.  The parties are also to state what further proceedings are anticipated regarding any remaining issues, whether by way of discovery, motion practice, or trial.

### E. Motion to Dismiss

For the reasons discussed above, the Court finds the Authority's jurisdictional arguments without merit.  Insofar as the Authority's motion to dismiss (Dkt. No. 25) is brought pursuant to Rule 12(b)(1), it is denied.

Further, the Court has deemed that plaintiff's First Amendment claim is not only plausible, but likely to succeed.  As for the infirmities of the remaining claims raised by the Authority's motion to dismiss pursuant to Rule 12(b)(6) that are left unaddressed in this opinion, the Court will determine whether such issues remain to be adjudicated after it reviews the parties' forthcoming supplemental briefs.  Accordingly, the Court denies the Authority's motion to dismiss (Dkt. No. 25) without prejudice to renewal at a later stage of litigation.

## IV.    CONCLUSION

For the reasons above, plaintiff's motion for preliminary injunction (Dkt. No. 8) is **GRANTED**, and the Authority's motion to dismiss (Dkt. No. 25) is **DENIED**.  Plaintiff shall file its brief on remedy and further proceedings on or before January 23, 2026.  The Authority shall file its response brief within fourteen days of the service of plaintiff's brief.  The parties' briefs shall not exceed ten pages, exclusive of attachments.

**SO ORDERED.**

Dated: January 15, 2026
Utica, New York

Anthony J. Brindisi
U.S. District Judge

23